UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| In re:<br><br>SCOTT ETHAN CURTIS and<br>MEAGAN RAE CURTIS,<br><br>      Debtors. | Case No. 1:23-cv-00200-DCN<br><br>Adv. Case No. 21-06015-NGH<br>Bankr. Case No. 21-00521-NGH |
| WILLIAM GARDINER and SHANNON<br>GARDINER,<br><br>      Appellants,<br><br>v.<br><br>SCOTT ETHAN CURTIS and<br>MEAGAN RAE CURTIS,<br><br>      Appellees. | **MEMORANDUM DECISION AND<br>ORDER ON APPEAL** |

## I. INTRODUCTION

This matter comes before the Court on Appellants William and Shannon Gardiner's appeal of the final Memorandum Decision and Judgment entered by the United States Bankruptcy Court for the District of Idaho in *Gardiner v. Curtis (In re Curtis)*, Adv. Case No. 21-06015-NGH. The appeal has been fully briefed and is ripe for the Court's review. Having reviewed the record, the Court finds the parties have adequately presented the facts and legal arguments in their briefs. Accordingly, in the interest of avoiding further delay, and because it finds the decisional process would not be significantly aided by oral argument, the Court decides this appeal on the record and without oral argument. Dist.

Idaho Loc. Civ. R. 7.1(d)(1)(B).

For the reasons set forth below, the Bankruptcy Court is AFFIRMED.

## II. BACKGROUND

The general factual background underlying this dispute is set forth in the Bankruptcy Court's Memorandum Decision. Dkt. 7, at 6–11.[1] To the extent not outlined below, the background set forth by the Bankruptcy Court is incorporated by reference. *Id*.

In April of 2020, Appellants William and Shannon Gardiner (collectively, the "Gardiners") hired BFH Idaho, LLC ("BFH")—a company created by Appellees Scott and Meagan Curtis (collectively, the "Curtises")—to construct a log cabin near High Valley, Idaho. *Id*. at 7. The construction contract between the Gardiners and BFH[2] provided the total cost for the cabin would be $722,341.00. *Id*. at 8.

To fund construction, the Gardiners obtained a loan from Idaho Central Credit Union ("ICCU"). *Id*. The Curtises could access the Gardiners' loan funds through draw requests—submitted through ICCU's "getbuilt.com" system—for construction expenses. *Id*. To make a draw request, Meagan Curtis submitted the amount necessary to pay various vendors and suppliers, as well as supporting documents and invoices as requested by ICCU, through the getbuilt.com system. *Id*. ICCU also retained professional independent inspectors who periodically inspected the cabin site and submitted written reports, with

---

[1] Unless otherwise referenced, citations are to the CM/ECF-generated page number in the instant civil case.

[2] While the construction contract was between BFH and the Gardiners, the Bankruptcy Court explained all of the Gardiners' dealings with BFH went through the Curtises, and that the Gardiners' allegations in the adversary proceeding involved only actions taken by the Curtises. Dkt. 7, at 11–12. As such, the Bankruptcy Court held the Curtises could be held personally liable to the extent they actively participated in, or were responsible for, the alleged wrongdoing of BFH. The Curtises have not appealed this holding.

photographs showing the progress of the job, to ICCU. Dkt. 8, at 7. These reports were also available in the getbuilt.com system. *Compare* Dkt. 7-3, at 118, ¶ 21 *with* Dkt. 7-3, at 191, ¶ 21.

When the Curtises submitted a draw request, the Gardiners received a notification and would have to approve the request before loan funds were released. Dkt. 7, at 8. Once a draw request was approved, the funds were paid by ICCU to a title company, which then transferred the money into BFH's bank account. *Id*.; Dkt. 6, at 11. During the bench trial in the underlying adversary proceeding, the Curtises testified they believed the Gardiners had access to the getbuilt.com system and could see the full details of the draw requests and supporting documentation. Dkt. 7, at 8. However, the Gardiners maintained they were unable to view the getbuilt.com system until they later requested access to the system in approximately November of 2020. *Id*. at 8–9; Dkt. 6, at 11. In total during the cabin construction, the Curtises submitted 11 draws—each of which was approved by the Gardiners—for a total of $549,251.99. Dkt. 7, at 9.

From its inception, construction of the cabin was plagued by various problems, including multiple mistakes by subcontractors and suppliers, unsafe road conditions caused by severe winter weather, and several accidents involving vehicles and construction equipment at the building site. *Id*. at 9–10. In addition, building costs skyrocketed due to material and labor shortages caused by the COVID-19 pandemic. Dkt. 7, at 132:5–14, 181:1–23, 194:3–25, 524:8–23. During trial, Scott Curtis and others testified that building

costs escalated as much as 200 percent during construction of the Gardiners' cabin.[3] *Id*. As a result of escalating costs and the many issues with the project, the Curtises maintain they spent more than $43,000.00 of their own money—above and beyond the total amount they withdrew from the Gardiners' ICCU loan—on the Gardiners' cabin. Dkt. 8, at 14.

By contrast, the Gardiners argue the Curtises had trouble with accounting and available funds throughout the project. Dkt. 6, at 11. As a result, the Gardiners highlight the Curtises ultimately sought and obtained a short-term cash loan from National Funding, requiring immediate and daily repayment. *Id*. The Gardiners maintain these "daily payments to National Funding began in mid-October 2020, and quickly served to dissipate the funds available to the Curtises." *Id*. In November of 2020, the parties exchanged emails regarding the progress of construction, remaining loan funds, and the next steps for the project. The Gardiners contend it became clear by late November 2020 that, "based on the actual work that had been done, the loan funds were fast being depleted with significant work still to be completed." *Id*. at 12.

Due to winter weather and unsafe conditions, work on the cabin stalled in December 2020. Dkt. 7, at 10. On December 14, 2020, the parties met to discuss the status of the project. *Id*. The Curtises testified they told the Gardiners during this meeting that they would not be able to finish the cabin within budget and would need approximately $120,000.00 in additional funds to complete construction. *Id*.

On December 15, 2020, the Gardiners sent the Curtises an email seeking the

---

[3] The Gardiners did not rebut such testimony. *See generally*, Dkt. 7, at 187:21–236:3, 526:24–530:1.

collection of $13,681.38, which the Gardiners maintained the Curtises had received loan funds for, but had not yet paid to suppliers or subcontractors. *Id*. Shortly thereafter, the Curtises hired an attorney, and the Gardiners hired another contractor to complete the construction of their cabin. *Id*. at 10–11. The Gardiners ultimately spent over $120,000.00 in additional funds to complete their project. *Id*. at 11.

On August 10, 2021, the Curtises filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. *Id*. On November 8, 2021, the Gardiners initiated an adversary proceeding against the Curtises pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4), and (a)(6).[4] Dkt. 7, at 11. The Gardiners ultimately sought a nondischargeable judgment against the Curtises for $41,782.47[5] in construction loan funds the Curtises received, but purportedly did not use for the Gardiners' project.[6] *See, e.g.*, *Id*. at 18; Dkt. 6, at 13–15. The Gardiners argued such funds should be nondischargeable because they were obtained through the Curtises' false representations, embezzlement, and conversion. Dkt. 7, at 14–24.

---

[4] The Gardiners abandoned their 11 U.S.C. § 523(a)(2)(B) claim prior to trial. Dkt. 7, at 70.

[5] In their Amended Complaint in the adversary proceeding, the Gardiners initially sought a non-dischargeable judgment in an amount no less than $361,735.72. Dkt. 7, at 40–44. The Gardiners do not address why their initial claim was apparently so drastically inflated, but, in any event, do not challenge the Bankruptcy Court's finding that the Gardiners ultimately argued $41,782.47 should be deemed nondischargeable. Dkt. 7, at 18. On appeal, the Gardiners maintain the Bankruptcy Court erred in declaring dischargeable the $41,782.47 in ICCU loan funds the Curtises withdrew but allegedly failed to use on the Gardiners' project. Dkt. 6, at 14.

[6] At trial, the Gardiners also maintained the Curtises knowingly made various false statements about their home building experience and capabilities. After finding the Curtises did not act with the requisite intent to deceive when representing their building experience and capabilities, the Bankruptcy Court held such statements did not support a finding of nondischargeability under § 523(a)(2)(A). Dkt. 7, at 14–17. Because the Gardiners have not appealed this holding (Dkt. 6, at 7), the Court does not further address it. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

After a three-day bench trial on December 6–8, 2022, followed by written closing arguments, the Bankruptcy Court held the Gardiners had not proven the elements of 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6) by a preponderance of the evidence, and thus could not have their claims declared nondischargeable. *Id*. at 6–24. Because it held their claims were not excepted from discharge, the Bankruptcy Court dismissed the Gardiners' Complaint and entered Judgment in favor of the Curtises. *Id*. at 26–27. The Gardiners timely filed the instant appeal. Dkt. 1.

## III. ISSUE ON APPEAL

On appeal, the Gardiners contend the Bankruptcy Court erred in denying their nondischargeability claims related to loan funds received by the Curtises, but purportedly not used for any portion of the Gardiners' cabin project. Dkt. 6, at 7.

## IV. STANDARD OF REVIEW

District courts review bankruptcy court decisions in the same manner as would the Ninth Circuit. *George v. City of Morro Bay* (*In re George*), 177 F.3d 885, 887 (9th Cir. 1999). "Whether a claim is nondischargeable presents a mixed question of fact and law and is reviewed de novo." *Carillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). However, the factual findings underlying a nondischargeability determination are reviewed for clear error. *Id*.; *Banks v. Gill Distrib. Ctrs., Inc. (In re Banks)*, 263 F.3d 862, 869 (9th Cir. 2001) ("Whether an actor behaved willfully and maliciously is ultimately a question of fact reserved for the trier of fact."); *Applegate v. Schuler (In re Schuler)*, 21 B.R. 643, 644 (Bankr. D. Idaho 1982) (explaining embezzlement under § 523(a)(4) requires an intent to deprive and whether the debtor acted with such intent is a question of fact). Thus, this

Court's standard of review is de novo, with due regard given to the Bankruptcy Court's factual findings unless clearly erroneous.[7] *Murray v. Bammer (In re Bammer)*, 131 F.3d 788, 792 (9th Cir. 1997).

## V. ANALYSIS

As noted, during the adversary proceeding, the Gardiners alleged nondischargeability claims under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).[8] The Bankruptcy Court was required to construe such exceptions to discharge strictly against the Gardiners and liberally in favor of the Curtises. *Custer v. Dobbs (In re Dobbs)*, 115 B.R. 258, 262 (Bankr. D. Idaho 1990). "Any other construction would be inconsistent with the liberal spirit that has always pervaded the entire bankruptcy system."[9] *Id*. (cleaned up). As such, the Gardiners had the burden of proving, by a preponderance of the evidence, each element of their claims for the discharge exception for debts obtained through false statements, embezzlement, and conversion. *Netwest Commc'ns Grp., Inc. v. Mills (In re Mills)*, 2008 WL 2787252, at *4 (Bankr. D. Idaho 2008) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

---

[7] A bankruptcy court's factual findings are clearly erroneous if they are illogical, implausible, or lack support in inferences that may be drawn from the facts in the record. *United States v. Hinkson*, 585 F.3d 1247, 1261 (9th Cir. 2009).

[8] Where, as here, a debtor files a petition under Chapter 7 of the Bankruptcy Code, the debtor will typically be discharged from all dischargeable unsecured debts arising before the petition was filed. 11 U.S.C. § 727(b). Yet, a party to whom a debt is owed has standing to challenge the dischargeability of the debt. Fed. R. Bankr. Proc. 4007(a). Debt may be excepted from discharge because, *inter alia*, the debtor incurred the debt through certain misconduct. *See generally*, 11 U.S.C. § 523.

[9] However, the various exceptions to discharge in § 523(a) also "reflect a conclusion on the part of Congress 'that the creditors' interest in recovering full payment of debts in these categories outweigh[s] the debtors' interest in a complete fresh start.'" *Cohen v. de la Cruz*, 523 U.S. 213, 222 (1998) (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

MEMORANDUM DECISION AND ORDER ON APPEAL – 7

### A. 11 U.S.C. § 523(a)(2)(A)

Section 523(a)(2)(A) bars the discharge of a debt obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). On appeal, the Gardiners challenge the Bankruptcy Court's holding with respect to the Curtises' alleged false statements regarding their use of the Gardiners' loan funds. Dkt. 6, at 16–21.

The elements of a § 523(a)(2)(A) exception to discharge claim are: (1) the debtor made a representation; (2) that at the time the debtor knew was false; (3) that the debtor made with the intention and purpose of deceiving the creditor; (4) that the creditor justifiably relied on such representation; and (4) the creditor sustained damages as the proximate result of the misrepresentation having been made. *Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010) (cleaned up). A promise made without a present intent to perform satisfies the first and second elements of a § 523(a)(2)(A) claim. *Welch v. Laraway (In re Laraway)*, 2010 WL 3703272, at *6 (Bankr. D. Idaho Sept. 13, 2020). However, the presence of a false representation by itself is not sufficient under § 523(a)(2)(A). "Not only must there be a representation of material fact which is false, the representation must be made with the intention and purpose to deceive." *Id.*; *PMM Invs., LLC v. Campbell* (*In re Campbell*), 490 B.R. 390, 401 (Bankr. D. Ariz. 2013) ("For a debt to be excepted from discharge [under § 523(a)(2)(A)] the debtor must actually intend to defraud the creditor."). Whether the debtor made misrepresentations with the intent and purpose to deceive "is a question of fact" that may be inferred from "the totality of the circumstances and circumstantial evidence." *Gout v. Garner (In re Garner)*, 2022 WL

3363681, at *4 (Bankr. D. Idaho 2022).

The Bankruptcy Court rejected the Gardiners' § 523(a)(2)(A) claim because the Gardiners failed to establish the Curtises made loan draw requests with the requisite fraudulent intent. Dkt. 7, at 18–19. On appeal, the Gardiners argue many cases have held a contractor's misrepresentations regarding the use of loan funds asked for in draw requests can support nondischargeability claims. Dkt. 6, at 17 (citing *Cripe v. Mathis (In re Mathis)*, 360 B.R. 662 (Bankr. C.D. Ill. 2006) and *In re Dobbs*, 115 B.R. 258 (Bankr. D. Idaho 1990)). While courts have so held, the facts in both *Mathis* and *Dobbs* illustrate the Bankruptcy Court's decision in this case was sound.

For instance, in *Mathis*, the bankruptcy court rejected the homeowner creditors' § 523(a)(2)(A) claim where, as here, the creditors alleged they advanced funds for the express purpose of paying certain subcontractors, but the contractor debtor failed to pay such subcontractors. *In re Mathis*, 360 B.R. at 667. In so holding, the *Mathis* court explained that while a failure to pay subcontractors the amount requested in draw requests may, in some cases, result in a nondischargeable debt under § 523(a)(2)(A), a creditor must show not only that the contractor made false statements, but also that the contractor made such misrepresentations without intending to pay the subcontractors. *Id*. The creditors in *Mathis* failed to establish this because, among other issues, they failed to show the contractor either diverted loan funds to other projects or converted such funds to his personal use. *Id*.

Like the creditors in *Mathis*, the Gardiners failed to present such evidence at trial. Dkt. 7, at 18–19; Dkt. 8, at 18–20. Instead, the record showed that the Curtises "performed

significant work on the cabin and properly paid most of the fees." Dkt. 7, at 19. The Bankruptcy Court explained that while the Gardiners "may have established" some draw requests did not "fully correspond with a receipt or bank record demonstrating the full amount of the request was utilized for the requested purpose," the Gardiners did not show the Curtises withdrew loan funds with the intent to misuse them. *Id*. As such, the Bankruptcy Court correctly held the Gardiners did not meet their burden under § 523(a)(2)(A). *Id*.; *In re Mathis*, 360 B.R. at 667.

Significantly, in *Dobbs*, the debtor contractor testified that he had a practice of depositing loan proceeds from a specific construction project into a general operating account, and then using those funds "not necessarily to first satisfy outstanding claims against that particular construction project, but to pay whatever expenses and bills most demanded immediate attention." 115 B.R. at 262. That is, the contractor admitted he used funds from one customer's loan to satisfy debts on another customer's construction project. *Id*. at 266. Despite this admitted practice, the bankruptcy court held the creditor failed to establish the intent element of § 523(a)(2)(A) with respect to specific loan disbursements the creditor could not show were diverted to other uses by the contractor. *Id*. at 267. The court so held even though it was clear some funds must have been diverted because there were $75,000.00 in outstanding subcontractor liens on the construction project.[10] *Id*.

The contractor in *Dobbs* testified that he sincerely intended to satisfy all claims on

---

[10] By contrast, here there was apparently no evidence of any subcontractor liens on the Gardiners' cabin submitted during trial. *Compare* Dkt. 8, at 15 *with* Dkt. 10. Creditors cannot prevail on a § 523(a)(2)(A) claim where, as it appears here, they fail to establish they were damaged by their reliance. *In re Laraway*. 2010 WL 3703272, at *9.

the creditors' construction project from, among other things, anticipated income. *Id*. at 267. In light of such testimony, the bankruptcy court held the creditors could impeach the contractor through circumstantial evidence. *Id*. The court held the creditors failed to do so with respect to specific disbursements they could not establish were diverted to other projects or to the contractor's personal expenses. *Id*. Similarly, here, as in *Mathis* and *Dobbs*, the Gardiners failed to present either direct evidence of the Curtises' wrongful intent, or circumstantial evidence to suggest the Curtises intended to use loan funds for any purpose other than the construction of the Gardiners' cabin. Dkt. 7, at 18–19; *In re Mathis*, 360 B.R. at 667; *In re Dobbs*, 115 B.R. at 267. In fact, as noted, the Curtises testified they not only used the entirety of the ICCU loan funds they withdrew to cover the Gardiners' construction costs, but also incurred, and used their own money to pay, over $43,000.00 in expenses above the amount they drew for the project. Dkt. 7, at 235:10–234:1, 294:18–295:5, 485:15–486:4, 539:24–540:6; Dkt. 8, at 15.

During the adversary proceeding, the Gardiners highlighted several invoiced payments they claimed were either never paid for by the Curtises, or were paid less than invoiced amount, to support their assertion that loan funds were misused. Dkt. 7, at 18. The Bankruptcy Court noted that some of these invoices were in fact paid in whole or in part. *Id*. On appeal, the Gardiners challenge the Bankruptcy Court's factual findings with respect to the specific amount the Curtises paid three subcontractors. Specifically, while the Gardiners admit the Bankruptcy Court correctly determined the Curtises paid $5,400.00 to Donny Stevens Trucking, Inc. ("DST")—invoiced in Draw No. 5—the Gardiners suggest the Bankruptcy Court failed to recognize that Draw No. 6 sought a second payment for

DST of an additional $5,400.00. Dkt. 6, at 19. The Gardiners maintain it was this second draw request that the Curtises withdrew from the ICCU loan but never paid to DST. *Id*. As such, the Gardiners argue "the Bankruptcy Court erroneously concluded that the missing [DST] payment had actually been paid and this finding should be reversed." *Id*. at 19–20.

Notably, the Gardiners do not contend they were required to reimburse DST for any amount beyond the $5,400.00 they admit the Curtises paid DST in conjunction with Draw No. 5. Dkt. 6, at 19–20. Nor do the Gardiners maintain DST placed a lien on the cabin for nonpayment, or that DST has otherwise asserted it was not paid for its services. *Id*. And, although Draw No. 6 sought another payment of $5,400.00 for DST, the Gardiners ignore the Curtises' explanation that DST mistakenly dumped and abandoned the first load of logs for the Gardiners' project miles away from the cabin site. As a result, the Curtises were forced to find (and pay) another company—Nation Transport Service—to complete the work DST was initially hired to perform. Dkt. 8, at 17–18; Dkt. 7, at 203:7–204:3, 369:15–21. In addition, Scott Curtis made thirteen solo trips to pick up the first load of logs and bring them to the cabin site himself, and incurred various expenses in doing so. *Id*. Thus, the Curtises showed—and the Gardiners failed to rebut—that the funds initially drawn for DST were used for the Gardiners' cabin project, albeit for a different subcontractor and for expenses incurred when DST failed to adequately perform. *Compare* Dkt. 8 *with* Dkt. 10.

The Gardiners make similar arguments with respect to payments the Bankruptcy Court found the Curtises made to Franklin Building Supply and ICF of Idaho ("ICF"). Dkt. 6, at 20–21. For instance, the Gardiners argue the Bankruptcy Court erroneously concluded the Curtises paid $11,119.46—requested in Draw No. 7—to Franklin Building Supply. *Id*.

at 20. Although the Gardiners admit the Curtises paid Franklin Building Supply $13,370.47—over $2,000.00 *more* than the Curtises requested for Franklin Building Supply in Draw No. 7—the Gardiners suggest the Curtises did not submit documentation to substantiate that this $13,370.47 payment was for the Gardiners' project. *Id*. Yet, despite their burden to establish the elements of their § 523(a)(2)(A) claim by a preponderance of the evidence, the Gardiners do not cite anything in the record—such as a subcontractors' lien or even an unpaid bill notice—to suggest the $13,370.47 the Curtises paid Franklin Building Supply was *not* for the Gardiners' cabin. *Id*. As such, the Court cannot find the Bankruptcy Court erred in finding the Curtises paid Franklin Building Supply in full for the Gardiners' project. Dkt. 7, at 18.

Moreover, the Curtises explain that they ultimately paid Franklin Building Supply a total of $28,190.62—substantially more than the $11,119.46 they withdrew from the Gardiners' ICCU loan—due to the increased expenses on the Gardiners' project. Dkt. 8, at 15. Again, as a result of such overages, the Curtises funneled approximately $43,00.00 more than the total they drew from the Gardiner's loan into the Gardiners' cabin. *Id*. at 18. That the Curtises used their own money to cover the increased expenses on the Gardiners' project underscores their lack of any wrongful intent. *Mire v. Ankersmit (In re Ankersmit)*, 03.1 I.B.C.R. 70 (Bankr. D. Idaho Mar. 5, 2003) (holding contractor's use of his own funds to complete debtors' project was not consistent with an intent to deceive).

Next, the Gardiners note the Curtises requested $6,837.38 to pay ICF in Draw No. 2. Dkt. 6, at 20. Although the Gardiners admit the Curtises paid ICF $6,347.38, the Gardiners highlight this payment was $490.00 less than the amount drawn. *Id*. at 21. The

MEMORANDUM DECISION AND ORDER ON APPEAL – 13

Gardiners suggest the Bankruptcy Court erroneously concluded the Curtises later made a subsequent payment to ICF of $4,575.00 because that subsequent payment was paid to another subcontractor for ICF materials, rather than directly to ICF. *Id*. Additionally, the Gardiners highlight the subsequent payment was covered by Draw No. 6. *Id*. Yet, the Gardiners do not suggest the remaining $490.00 was used for anything other than for the construction of their cabin. And, as with DST and Franklin Building Supply, the Gardiners fail to cite any evidence in the record to suggest that ICF has asserted it was not paid in full. In fact, as the Curtises highlight, the Gardiners do not cite specific evidence to establish that the Curtises failed to pay *any* subcontractors for their work on the project.[11] *Compare* Dkt. 8, at 15, 17, 20 *with* Dkt. 6, at 19–21 and Dkt. 10.

Further, the Bankruptcy Court specifically highlighted that ICF did not timely deliver blocks for the cabin's foundation, failed to provide sufficient quantities, and incorrectly installed the blocks. Dkt. 7, at 9. Given such issues, Scott Curtis testified that he had to work on the blocks, and incurred significant expenses—for which he did not bill the Gardiners—in doing so. Dkt. 7, at 210:15–211:7. Thus, as with DST, it appears the Curtises did not make false statements when initially requesting a specific amount to pay ICF, but rather were later forced to reallocate such funds as a result of ICF's mistakes.

---

[11] The Gardiners do outline several differences between the amounts funded from their ICCU loan and the amounts the Curtises paid certain subcontractors, and contend they were "later required to fund some of those expenses from other funds and also repay loan amounts that had been drawn to Curtises but not used on the Gardiner project (in essence, because the loan funds had been drawn, the Gardiners paid twice for those things)." Dkt. 6, at 13. However, the Gardiners do not identify any specific subcontractors they were purportedly forced to pay twice, and as noted, do not appear to have submitted evidence to establish that they were forced to pay specific subcontractors twice during trial. As such, in addition to failing to show the Curtises acted with the requisite intent, it appears the Gardiners did not establish the injury element of their § 523(a)(2)(A) claim during the adversary proceeding.

Even if this assumption is incorrect and the Curtises only paid ICF $6,347.38 of ICF's $6,837.38 bill, this payment supports the Bankruptcy Court's conclusion that the Curtises lacked the requisite intent since they worked on the cabin for months and paid the project's invoices "in whole or *in part*." Dkt. 7, at 18 (emphasis added) (citing *Sullivan v. Ratz*, 551 B.R. 338, 350 (N.D. Ill. 2016) (finding debtor failed to establish intent element of § 523(a)(2)(A) because although contractor's "record-keeping and project management skills certainly left something to be desired," debtor did not prove that contractor took funds with "no intention of actually using them to complete her bathroom"). Because the Curtises performed significant work on the Gardiners' cabin and properly paid subcontractors and suppliers most, if not all, of the funds they drew on the Gardiners' ICCU loan, the Court affirms the Bankruptcy Court's holding that the Curtises did not act with the intent to deceive the Gardiners.[12]

In short, because the Gardiners failed to establish the Curtises withdrew loan funds with the intent to misuse them, the Bankruptcy Court appropriately rejected their § 523(a)(2)(A) claim. Dkt. 7, at 19; *In re Mathis*, 360 B.R. at 667; *In re Dobbs*, 115 B.R. at 267; *Kunda v. Shaul (In re Shaul)*, 579 B.R. 231, 243 (Bankr. D. Ore. 2017) (holding contractor lacked fraudulent intent, although he was "sloppy in his accounting for the funds

---

[12] As noted, the Gardiners argue on appeal that $41,782.47 was requested through draw requests but cannot accounted for. Dkt. 6, at 14. However, the Curtises submitted a total of 11 draws, each of which was approved by the Gardiners, for a total of $549,251.99. Dkt. 7, at 9. Thus, it appears to be undisputed the Curtises properly used, at a minimum, $507,469.52 of the total they drew on the ICCU loan for the Gardiners' project. That the Curtises used at least 92% of the loan funds they obtained on the Gardiners' cabin further justifies the Bankruptcy Court's holding that the Curtises lacked the requisite intent—regardless of the specific amount the Gardiners paid DST, Franklin Building Supply, and ICF. Dkt. 7, at 19.

MEMORANDUM DECISION AND ORDER ON APPEAL – 15

he received" because such evidence did not establish contractor "intended to obtain funds from [debtor homeowner] without intending to complete the work on the project as agreed"); *Sullivan*, 551 B.R. at 350 (holding bankruptcy court appropriately denied creditor's § 523(a)(2)(A) claim because creditor did not show debtor contractor took loan funds with no intention of actually using them on creditor's project). The Court accordingly affirms the Bankruptcy Court's rejection of the Gardiners' § 523(a)(2)(A) claim.

### B. 11 U.S.C. § 523(a)(4)

The Gardiners also appeal the Bankruptcy Court's denial of their § 523(a)(4) claim. Under § 523(a)(4), a debt is nondischargeable if it was obtained through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(2)(A). During the adversary proceeding, the Gardiners asserted embezzlement, claiming the Curtises misappropriated loan funds for a purpose other then what the draw requests indicated. Dkt. 7, at 20.

"In the nondischargeability context, embezzlement is defined as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or in whose hands it has lawfully come." *Murray v. Woodman (In re Woodman)*, 451 B.R. 31, 41 (Bankr. D. Idaho 2011) (quoting *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991)). To establish nondischargeability due to embezzlement, "a creditor must demonstrate (1) that property was rightfully in the possession of a nonowner, (2) that the nonowner appropriated the property to a use other than for which it was entrusted, and (3) the circumstances indicating fraud." *King v. Lough (In re Lough)*, 422 B.R. 727, 735 (Bankr. D. Idaho 2021). Circumstances indicating fraud

can include the presence of fraud, when the debtor acted with fraudulent intent, or when the debtor intended to conceal misappropriations from the creditor. *Brown v. Johnson (In re Johnson)*, 2021 WL 560093, at \*7 (Bankr. D. Idaho Feb. 10, 2021); *In re Campbell*, 490 B.R. at 402.

The Bankruptcy Court held the Gardiners did not meet their burden under § 523(a)(4) for two reasons. First, although the Gardiners maintained they could not account for $41,782.47 the Curtises withdrew through draw requests, the Gardiners failed to establish such funds were not used for the construction of their cabin. Dkt. 7, at 21. Second, the Gardiners did not present sufficient evidence of the Curtises' wrongful intent or circumstances indicating fraud. *Id*. The Gardiners challenge both of these holdings on appeal.

With respect to the former, the Gardiners suggest the Bankruptcy Court erred in determining that the facts at trial did not support the non-use of funds for the Gardiners' project. Dkt. 6, at 23. The Gardiners base this contention almost entirely on their arguments with respect to DST, Franklin Building Supply, and ICF, which this Court addressed—and rejected—above. Dkt. 6, at 23.

In addition to their arguments regarding DST, Franklin Building Supply, and ICF, the Gardiners argue the Bankruptcy Court "erred by concluding that the Gardiners bore the duty of showing exactly what the funds were actually used for." *Id*. The Gardiners suggest "this duty should not rest with the Gardiners—what the Gardiners must show is that the funds were not used for their project; it is not their duty to search out the actual use of the funds." *Id*. This contention misleadingly ignores that the Bankruptcy Court specifically

MEMORANDUM DECISION AND ORDER ON APPEAL – 17

held the Gardiners did not establish the $41,782.47 in missing funds *were not used for their project*. Dkt. 7, at 18–19, 21. The Bankruptcy Court did not force the Gardiners "to search out the actual use of the funds," but rather required the Gardiners to meet their burden of establishing $41,782.47 in withdrawn loan funds were not used on their project. Because the Gardiners failed to do so, the Bankruptcy Court appropriately rejected the Gardiners' § 523(a)(4) claim.[13] Dkt. 7, at 21 ("Plaintiffs have not adequately established that these funds were not used for the construction of the cabin on their Property.").

Finally, the Gardiners suggest the Curtises misappropriated the ICCU loan funds for their own purposes by making payments on the Merchant Cash Advance loan the Curtises received from National Funding in October of 2020. While the Gardiners made this argument during the adversary proceeding, the Bankruptcy Court found it unsupported by the evidence because the Curtises received the National Funding loan on October 13, 2020—after the Curtises had already received funds from 7 of the 11 draw requests—and after the Curtises had already paid the majority of the expenses incurred on the Gardiners' cabin. Dkt. 7, at 21. In addition, the Curtises' bank records demonstrated the ICCU loan funds were not the only source of money deposited into their bank account at the time they

---

[13] The Gardiners contend the Curtises misused loan funds because "despite representing that the draw funds would be used for specific purposes, on many occasions the Curtises failed to use the funds (either at all, or in part) as indicated in the draw requests." Dkt. 6, at 22. The Gardiners argue the Curtises' failure to use $41,782.47 as outlined in draw requests indicates fraud. *Id*. at 23. Yet, due to the skyrocketing costs associated with the pandemic and multiple mistakes by subcontractors and suppliers, it appears the Curtises nevertheless used all of the loan funds they withdrew on the Gardiners' cabin. Thus, it seems the Gardiners did not misuse loan funds—regardless of whether such funds were used precisely as outlined in the draw requests—but rather used the entirety of the withdrawn loan funds on the Gardiners' cabin as a result of the many issues complicating the project. *In re Shuler*, 21 B.R. at 644 (explaining embezzlement under § 523(a)(4) requires an intent to deprive and an intent to deprive is not inferable if the fact the debtor failed to make payments was caused by circumstances or conditions beyond the debtor's control).

made payments to National Funding. *Id*. Instead, the Curtises' bank account consistently had other deposits in varying amounts. *Id*. Because the Gardiners do not substantively address this holding on appeal, the Court rejects their contention that the Curtises' payments on the National Funding loan suggests the Curtises misappropriated the Gardiners' ICCU loan funds under circumstances indicating fraud. Dkt. 6, at 23–24; Dkt. 10.

In sum, the Bankruptcy Court appropriately determined the Gardiners failed to establish either that the Curtises misappropriated the Gardiners' loan funds, or that the Curtises acted with fraudulent intent. Dkt. 7, at 20–22. The Court accordingly affirms the Bankruptcy Court's holding that the Curtises failed to meet their burden under § 523(a)(4).

### C. 11 U.S.C. § 523(a)(6)

The Gardiners last contend the Bankruptcy Court erred when it determined the Gardiners failed to establish the Curtises acted with the specific intent to deprive under § 523(a)(6). Under § 523(a)(6), a debtor is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). "An exception under § 523(a)(6) requires proof of two primary, separate elements: (1) that the debtor's conduct in inflicting injury on another was willful; and (2) that the debtor's actions inflicting the injury were malicious." *Masuo v. Galan (In re Galan)*, 455 B.R. 214, 222 (Bankr. D. Idaho 2011) (citing *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 706 (9th Cir. 2009)).

Section 523(a)(6)'s "willfulness element requires that, for a debt to be excepted from discharge, the infliction of an injury must have been deliberate or intentional[.]" *Id*.

(citing *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998)). As such, "it is not sufficient to show that a debtor was reckless, negligent, or even that she committed a deliberate or intentional act which resulted in injury, if the infliction of the injury itself was not deliberate or intentional." *In re Galan*, 455 B.R. at 222. A debtor's conduct is "malicious" under § 523(a)(6) if the debtor committed (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) which was done without just cause or excuse. *Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 831 (9th Cir. BAP 2006)."The conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of § 523(a)(6)."[14] *Del Bino v. Bailey (In re Bailey)*, 197 F.3d 997, 1000 (9th Cir. 1999) (quoting *Transamerica Comm. Fin. Corp. v. Littleton*, 942 F.2d 551, 554 (9th Cir. 1994)).

Although conversion can support a finding of nondischargeability under § 523(a)(6), a creditor must show that a debtor converted collateral "with the specific intent of depriving the creditor of its collateral or did so knowing, with substantial certainty, that the creditor would be harmed by the conversion." *In re Armstrong*, 2006 WL 2850527, at *11 (quoting *Spokane Railway Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, (Bankr. D. Idaho 2000)). Thus, if the conversion was the result of an "honest but erroneous

---

[14] "While bankruptcy law governs whether a claim is nondischargeable under § 523(a)(6), the court looks to state law to determine whether an act falls within the tort of conversion." *Cadleway Props., Inc., v. Armstrong (In re Armstrong)*, 2006 WL 2850527, at *12 (Bankr. D. Idaho Oct. 3, 2006) (cleaned up). Under Idaho law, conversion is "defined as a distinct act of dominion wrongfully asserted over another's personal property in denial of or inconsistent with rights therein." *Peasley Transfer & Storage Co. v. Smith*, 979 P.2d 605, 616 (Idaho 1998) (citing *Luzar v. Western Sur. Co.*, 692 P.2d 337, 340 (Idaho 1984)).

belief there is authority to sell or dispose of the collateral and use the proceeds, even if such conduct can be viewed as negligent, unreasonable or reckless," the debtor lacked the requisite intent to cause injury required under § 523(a)(6). *Id*.

On appeal, the Gardiners argue at least $41,782.47 in draw funds were not used for the stated purpose, but were instead intentionally used by the Curtises for some other purpose. Dkt. 6, at 27. As with their § 523(a)(2)(A) and 523(a)(4) claims, the Gardiners again ignore that the Bankruptcy Court repeatedly held the Gardiners did not meet their burden of establishing the Curtises used loan funds for anything other than the construction of the Gardiners' cabin. *Compare* Dkt. 6, at 27–29 *with* Dkt. 7, at 18–24. Ultimately, because the Gardiners did not present sufficient evidence that the Curtises either misused, misappropriated, or converted loan funds, the Bankruptcy Court appropriately rejected the Gardiners' § 523(a)(6) claim. Dkt. 7, at 23 ("As noted previously, Plaintiffs have not presented sufficient evidence that Defendants used any of the loan funds for their personal use."); *Id*. at 21 ("Plaintiffs have not adequately established that these funds were not used for the construction of the cabin on their property"); *In re Armstrong*, 2006 WL 2850527, at *6 ("The measure of damages for a conversion violating § 523(a)(6) is the value of property converted or diverted."). Stated another way, because the Gardiners failed to establish the Curtises used $41,782.47 on any expenses other than those related to the Gardiners' project, the Bankruptcy Court did not need to address the intent element of the Gardiners' § 523(a)(6) claim.

Further, even if $41,782.47 cannot be properly accounted for, the Gardiners did not establish the Curtises acted with the specific intent to deprive the Gardiners of such funds,

as required under § 523(a)(6). Dkt. 7, at 23. On appeal, the Gardiners highlight that "[w]hen a wrongful act, such as conversion, produces harm and is without just cause or excuse, it is willful and malicious even absent proof of specific intent to injure." Dkt. 6, at 27 (citing *McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 604 (9th Cir. BAP 1998)). The Gardiners suggest that for all later draw requests, the Curtises "knew the draw funds were the only non-loan funds coming into BFH Idaho at the time, so they knew those draw funds would be used for purposes other than what was represented in the draw request (including, but not limited to, payments on the National Funding and other loans)." Dkt. 6, at 27. As discussed above, the Bankruptcy Court specifically addressed the National Funding loan, and explained the ICCU loan funds were not the only source of money coming into the Curtises' account at the time they made payments on the National Funding loan. Dkt. 7, at 21–22. And, as also noted, the Gardiners do not substantively address this holding on appeal. Dkt. 6, at 23, 27–29; Dkt. 10. Consequently, the existence of the National Funding loan (or any other unspecified loans) does not establish the Curtises intentionally used draw funds for anything other than the Gardiners' project. The Court accordingly affirms the Bankruptcy Court's holding that the Gardiners failed to establish the Curtises acted willfully or maliciously under § 523(a)(6). Dkt. 7, at 23–24.

### D. Appellees' Arguments

Although the Court affirms the Bankruptcy Court in all respects, it briefly addresses the Curtises' arguments in response to the Gardiners' appeal in the interest of completeness. The Curtises argue that while the basic theories of the Gardiners' Amended Complaint were fraud, embezzlement, conversion of loan funds, and willful/malicious

conduct with respect to the ICCU loan, the "trial, on the other hand, was based on misrepresentation of the experience, qualifications, and quality of work done by the Appellees for the most part." Dkt. 8, at 10. The Curtises suggest the instant appeal was thus brought in bad faith because the Amended Complaint did not include the Gardiners' claim that their loan funds were not used as outlined in the draw requests. However, paragraphs 14 and 15 of the Amended Complaint put the Curtises' use of loan funds at issue (Dkt. 7, at 39), and, as outlined herein, the Bankruptcy Court devoted a significant portion of its decision to addressing this issue. Dkt. 7, at 17–21. The Court accordingly finds the Curtises' use of loan funds was validly raised during the adversary proceeding, and was properly adjudicated by the Bankruptcy Court. As such, the Court rejects the Curtises' argument that the Gardiners' appeal is improper.

The Curtises also suggest the Gardiners pursued this appeal in bad faith under certain Ninth Circuit authority and pursuant to Federal Rule of Bankruptcy Procedure 8020.[15] Such authorities discuss "meritless" appeals or appeals without "worthy arguments" regarding why factual determinations are clearly erroneous. *See, e.g., Convergence Corp. v. Sony Corp.*, 681 F.2d 622, 623 (9th Cir. 1982) ("An appeal is considered frivolous in this circuit when the result is obvious, or the appellant's arguments of error are wholly without merit") (quoting *McConnell v. Critchlow*, 661 F.2d 116, 118 (9th Cir. 1981); *Kwasigroch v. Denoce (In re Neff)*, 2013 WL 1897019, at *8 (9th Cir. BAP 2013).

---

[15] Rule 8020 allows a court to award damages and "single or double costs to the appellee" upon determining that an appeal is "frivolous." Fed. R. Bankr. Proc. 8020.

While the Court finds the Bankruptcy Court's factual findings *were not* clearly erroneous, it believes the Gardiners nevertheless presented additional pertinent information which could have undermined the Bankruptcy Court's factual findings with respect to DST, Franklin Building Supply, and ICF. Such information was relevant because, as the Gardiners highlight, most of the Bankruptcy Court's factual conclusions regarding the over-payment or non-payment of drawn funds were based on its conclusions with respect to DST, Franklin Building Supply, and ICF. Dkt. 6, at 21; Dkt. 7, at 18–19. As such, the Court does not find the Gardiners' appeal lacks worthy arguments or is wholly without merit.

Still, as explained above, both the additional context provided by the Curtises, and the record on appeal, illustrate the Bankruptcy Court correctly held the Curtises completed significant work on the project and properly paid subcontractors and suppliers most, if not all, of the withdrawn funds. Thus, although the Curtises' "record-keeping and project management skills" may have left something to be desired, the Gardiners did not establish the Curtises intentionally misused loan funds for a purpose other than the construction of the Gardiners' cabin. *Sullivan*, 551 B.R. at 350.

## VI. CONCLUSION

After reviewing the Bankruptcy Court's decision, the briefing on appeal, and the entirety of the appellate record, the Court affirms the Bankruptcy Court's holding that the Gardiners failed to establish either that the Curtises acted with the requisite fraudulent intent, or that the Curtises used the Gardiners' loan funds for anything other than the construction of the Gardiners' cabin. Instead, although faced with skyrocketing costs and

countless obstacles, the Curtises diligently worked on the cabin and paid debts on the project up until the date they were essentially terminated. In addition, the Curtises used $43,000.00 of their own money on the Gardiners' project—more than the $41,782.47 the Gardiners suggest the Curtises misappropriated—in an attempt to complete the cabin. Such facts are simply incompatible with the wrongful intent required to declare the Gardiners' claims nondischargeable under § 523(a)(2)(A), 523(a)(4), and 523(a)(6). The Court accordingly AFFIRMS.

## VII. ORDER

**IT IS HEREBY ORDERED**:

1. The Bankruptcy Court's holding that the Gardiners failed to meet their burden of establishing, by a preponderance of the evidence, the requisite elements of their claims under 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6), and thus did not prevail in their adversary proceeding to have their claims declared nondischargeable, is **AFFIRMED** in its entirety;

2. Neither the Gardiners nor the Curtises are entitled to an award of attorneys' fees or costs on appeal;

3. The Court will enter a separate judgment pursuant to Federal Rule of Civil Procedure 58.

DATED: January 27, 2025

David C. Nye
Chief U.S. District Court Judge